```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
                                                                  :
MICHAEL TORRES,                                                   :
                                                                  :
                        Plaintiff,                                :    **MEMORANDUM DECISION**
                                                                  :    **AND ORDER**
            - against -                                           :
                                                                  :    15-cv-7097 (BMC)
NICHOLAS LALOTA and SUFFOLK COUNTY                                :
BOARD OF ELECTIONS,                                               :
                                                                  :
                        Defendants.                               :
                                                                  :
----------------------------------------------------------------- X
```

**COGAN**, District Judge.

Plaintiff brings this § 1983 action against his former boss and county employer for terminating his employment in retaliation for exercising his First Amendment rights. Defendants move for summary judgment dismissing the claim on the bases that (1) the Suffolk County Board of Elections is a partisan agency from which any employee can be terminated for political reasons; and (2) plaintiff's role within the Board of Elections was subject to the "policymaker exception" to the First Amendment. Defendant LaLota alternatively argues that he is entitled to qualified immunity. Because plaintiff's position was subject to the policymaker exception, defendants' motion for summary judgment is granted.

## BACKGROUND

### I. The Board

The Suffolk County Board of Elections (the "Board") is an agency created by Suffolk County pursuant to New York State Election Law. Its purpose is to oversee all aspects of the electoral process in Suffolk County, including voter registration, election procedures, tabulation of election results, campaign practices, and compliance with election law. As described by

plaintiff, the Board's ultimate responsibility is to "ensure a fair electoral and democratic process."

The Board consists of a Republican Administration and a Democratic Administration, and has a total of 123 employees "divided equally between" the two.[1] Each Administration has a Commissioner at the top, followed in descending rank by the Deputy Commissioner, Senior Assistant Commissioner, and Assistant Commissioner. The Hispanic Outreach Coordinator ranks somewhere below the Commissioner and reports to him directly.

The two Commissioners are chosen by their respective county party chairperson, and each Commissioner appoints his staff of approximately 60 people with the advice of town and county party chairs. Beginning in 2014, prospective Board employees have been required to submit an application form, although Board employees remain civil-service exempt.

In each Administration, the only overtime-exempt employees are the Commissioner, Deputy Commissioner, Senior Assistant Commissioner, Assistant Commissioner, and Hispanic Outreach Coordinator. The people in these positions are paid a salary, whereas all other Board employees receive an hourly wage.

## II.     Plaintiff's Role on the Board

In 2007, the Board's Republican Commissioner hired plaintiff to be his Senior Assistant Commissioner. In pursuing this position, plaintiff did not prepare a job application but did submit a resume. After interviewing with the Commissioner and receiving a recommendation from the Suffolk County Republican Chairman, plaintiff was offered the job.

As the Republican Senior Assistant Commissioner, plaintiff's direct supervisor was the Republican Deputy Commissioner. Plaintiff earned an annual salary of around $105,000 and

---

[1] There is one person employed by the Board to handle IT functions for both Administrations.

was required to file a financial disclosure with the Suffolk County Board of Ethics for each year between 2010 and 2015.

There was no formal job description for the Senior Assistant Commissioner position; however, some of plaintiff's duties in that role included distributing voter registration materials to the public, uploading election results online, monitoring the scanning function on voting machines, and ensuring that the polling locations received the correct number of voting machines in working-order. Plaintiff also approved fire, library, school, and village requests for services as well as approved process server requests and certain FOIL requests.

In addition, plaintiff was the Commissioner's liaison to the Board's Processing Department, which is responsible for receiving mail, processing absentee ballots and voter registration forms, and entering information from these forms into the Board's master database. All data entry by the Republican Processing Department is supervised and double-checked by a member of the Democratic Administration. And when plaintiff left the Board office on official business, he was sometimes accompanied by his Democratic counterpart. For example, the Democratic Senior Assistant Commissioner would go with plaintiff to conduct voting machine audits.

At times, the Deputy Commissioner tasked plaintiff with executing or overseeing certain Board projects. In so doing, plaintiff would occasionally have to make sure that other Board employees did their jobs correctly. And on occasion, the department heads would update plaintiff with the status of a particular project, which new information plaintiff would then report to the Deputy Commissioner. Plaintiff frequently interacted with the Deputy Commissioner throughout the work day about ongoing projects.

### III. Plaintiff's Termination

One of the contested Suffolk County elections in 2015 was for a judgeship in the Town of Brookhaven. The Republican Party nominated Tara Scully for that position and the Conservative Party originally nominated Democrat Howard Heckman. When Heckman withdrew his candidacy to pursue another post, Jesus Garcia, the Brookhaven Republican Chairman and the Board's Republican Hispanic Outreach Coordinator, approached plaintiff about securing Scully the available Conservative Party nomination.

Plaintiff is a longtime member of the Suffolk County Conservative Party and, since 2010, has served as its Secretary. As Secretary, plaintiff is also on the Suffolk County Conservative Party's Executive Committee. Additionally, although there isn't an official voting alliance between the Suffolk County Conservative and Republican parties, there historically was a significant *de facto* connection between the two. The Conservative Party would often endorse candidates, including judges, put up by the Republican Party, and since 2015, it has done so 85%-90% of the time. Moreover, in any particular election, the Conservative Party would generally account for 7%-12% of the votes for Republican Party-run candidates.

Despite Garcia's entreaties, plaintiff supported Democratic candidate Stephen Ukeiley for the Conservative Party endorsement. Several days later, plaintiff was called to a meeting with Commissioner LaLota, the County Republican Chairman, and Garcia to discuss plaintiff's possible termination. During that meeting, the County Republican Chairman expressed his displeasure with plaintiff for not endorsing Scully. Plaintiff was terminated soon after.

In response to his firing, plaintiff brought the present suit against Commissioner LaLota and the Board for violations of his First Amendment rights of "speech, belief, activity and

4

association," as well as for violations of state labor law. Defendants move for summary judgment.

## DISCUSSION

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted). However, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).

A dispute as to a material fact is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The opposing party must put forward some "concrete evidence from which a reasonable juror could return a verdict in his favor" to withstand a motion for summary judgment. Id. at 256. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." Id. When deciding a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (internal quotation mark omitted).

"To prevail on a First Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff must prove by a preponderance of the evidence that (1) the expression at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally

5

protected expression, and (3) a causal relationship existed between the constitutionally protected expression and the retaliatory action." Camacho v. Brandon, 317 F.3d 153, 160 (2d Cir. 2003). "As a general rule, the dismissal of a public employee for purposes of political patronage infringes on the employee's First Amendment rights."[2] Regan v. Boogertman, 984 F.2d 577, 579 (2d Cir. 1993) (citing Elrod v. Burns, 427 U.S. 347, 360 (1976)). Thus, in most cases, "the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power[.]" Rutan v. Republican Party of Illinois, 497 U.S. 62, 64 (1990). This is because "conditioning employment on political activity pressures employees to pledge political allegiance to a party with which they prefer not to associate, to work for the election of political candidates they do not support, and to contribute money to be used to further policies with which they do not agree." Id.

However, political affiliation "may be an acceptable requirement for some types of government employment." Branti v. Finkel, 445 U.S.507, 518 (1980). Specifically, "political affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance." Savage v. Gorski, 850 F.2d 64, 68 (1988). People occupying these positions – so-called "policymakers" – are simply employees whose jobs call for party loyalty, which list encompasses "an endless variety of job responsibilities and varying degrees of discretion and autonomy." See Alberti v. County of Nassau, 393 F. Supp. 2d 151, 168 (E.D.N.Y. 2005) (quoting Flenner v. Sheahan, 107 F.3d 459, 465 (7th Ci. 1997)). Moreover, "a position may be appropriately considered political even though it is neither confidential nor policymaking

---

[2] At first blush this case would appear to sound in free speech, rather than political association, because the impetus for plaintiff's termination was his support for a particular candidate and not the fact that he was a member of the Conservative Party. However, an employee's outside political activities can inform his propensity for partisan loyalty (or disloyalty) in the workplace. See, e.g., Regan v. Boogertman, 984 F.2d 577, 578-79, 581-82 (2d Cir. 1993). Thus, what might appear in one context to be political speech can be used by an employer as a basis for termination under the policymaker exception to the First Amendment.

in character." Branti, 445 U.S. at 518. An example provided by Justice Stevens in Branti makes this idea abundantly clear:

> [I]f a State's election laws require that precincts be supervised by two election judges of different parties, a Republican judge could be legitimately discharged solely for changing his party registration. That conclusion would not depend on any finding that the job involved participation in policy decisions or access to confidential information. Rather, it would simply rest on the fact that party membership was essential to the discharge of the employee's governmental responsibilities.

Id. Thus, the relevant distinction between a policymaker and a non-policymaker need not turn on the substance of an employee's role, but may also manifest in a more structural or definitional attribute of the job. In this way, the term "policymaker" itself is a misnomer, and can be better understood as a synecdoche for a position expected to be held by someone exhibiting uniform party loyalty. See id. ("[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement."); Regan, 984 F.2d at 580 ("although the label 'policymaker' itself is not necessarily determinative . . . we use it here as a convenient shorthand for a person occupying a position calling for party loyalty.").

The main purpose of the policymaker exception is to allow a politically accountable administration to protect its values by employing people who it can trust to faithfully abide by them. As the Second Circuit put it in Savage, 850 F.2d at 68, disallowing this exception "would severely handicap an incoming administrator's ability to carry out his proposed policies, thereby undercutting the effects of the electorate's vote."

In determining whether an employee's dismissal is permissible under the policymaker exception, a court may look to, *inter alia*,

> whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak

7

> in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders.

Vezzetti v. Pellegrini, 22 F.3d 483, 486 (2d Cir. 1994).

Additional factors courts consider are whether the employees at issue are ones "who act as advisers, who formulate plans for implementing broad goals, or whose responsibilities are either not well defined or of broad scope." Ness v. Marshall, 660 F.2d 517, 520 (3d Cir. 1981) (citing Elrod, 427 U.S. at 367-68)). Moreover, the Supreme Court has indicated that the ability to *hire* someone based on his political affiliation is relevant to whether that person can be *fired* because of his political affiliation. See Rutan, 497 U.S. at 74 ("A government's interest in securing employees who will loyally implement its policies can be adequately served by *choosing or dismissing* certain high-level employees on the basis of their political views" (emphasis added); "[T]he 'preservation of the democratic process' is no more furthered by the patronage promotions, transfers, and rehires at issue here than it is by patronage dismissals.").

Given the strong partisan character of the Suffolk County Board of Elections as well as the realities of plaintiff's role as the Republican Senior Assistant Commissioner, it is clear that plaintiff's termination was in accordance with the First Amendment policymaker exception.

At the outset, I note that the facts of Regan, which held that the policymaker exception applied, bear a striking resemblance to those of this case: Bonita Regan, a member of the Conservative Party, was appointed by the Republican Receiver of Taxes to be his Deputy Tax Receiver. Regan served comfortably in that position for seven years until, during an election year in which the Receiver was not up for reelection, Regan and the Conservative Party endorsed candidates within the Democratic Party. Following the election, Regan was fired. Although Regan argued that "her role as the Deputy Tax Collector was merely ministerial . . . [and that she

had] virtually no discretion," the Second Circuit held that her position was still subject to the policymaker exception based on "the power with which [it] is vested by law, and which is inherent in the office."

Beyond the similarities this case shares with Regan, upon which alone I would feel justified in granting defendants' motion, several other factors compel the same conclusion. To start, the Board itself is imbued by law with an unmistakably partisan character. Article II, Section 8 of the New York State Constitution ("Bi-partisan Registration and Election Boards") provides that

> [a]ll laws creating, regulating or affecting boards or officers charged with the duty of qualifying voters, or of distributing ballots to voters, or of receiving, recording or counting votes at elections, *shall secure equal representation of the two political parties* which, at the general election next preceding that for which such boards or officers are to serve, cast the highest and the next highest number of votes. *All such boards and officers shall be appointed or elected in such manner, and upon the nomination of such representatives of said parties* respectively, as the legislature may direct.

(Emphases added.) This confirms both that New York State boards of elections are structured according to party affiliation and that at least certain of their employees (all "boards and officers") are, by law, political appointments. Furthermore, New York Election Law § 3-300 states that "[e]very board of elections shall appoint, and at its pleasure remove, clerks, voting machine technicians, custodians and other employees . . . *and shall secure in the appointment of employees of the board of elections equal representation of the major political parties*" (emphasis added). As interpreted by the state courts, this provision "furthered the constitutional mandate of bipartisan participation in the functions of boards of elections (see, NY Const, art II, §8) and vested boards of election with complete and exclusive control of their personnel and the performance of their duties in that highly sensitive governmental area." See Cty. of Chautauqua

v. Chautauqua Cty. Emps.' Unit 6300 of Local 807 of Civ. Serv. Emps.' Ass'n, Inc., Local 1000, AFSCME, AFL-CIO, 181 A.D.2d 1052, 1052, 581 N.Y.S.2d 967, 967 (4th Dep't 1992).

Indeed, various positions within this state's boards of elections have been held subject to the policymaker exception. See, e.g., Millus v. D'Angelo, 224 F.3d 137 (2d Cir. 2000) (elections day operations coordinator); Hering v. Hill, 814 F. Supp. 356 (S.D.N.Y. 1993) (deputy commissioner); Mirabella v. Bd. of Elections of City of New York, 507 F. Supp. 338 (S.D.N.Y. 1980) (election inspectors). The reason for treating these bodies with such especial political sensitivity is a consequence of "the very nature of the election process," whereby fairness is ensured through the vigilance of interested partisan representatives. See Mirabella, 507 F. Supp. at 340; see also Hering, 814 F. Supp. at 357 ("The election laws of New York State . . . are based on the premise that a balance of power on boards of elections between political factions is a more realistic safeguard against partisan bias than an attempt to keep this phase of the electoral system free of partisan participation."). And when the partisan "interest" of one of these representatives can no longer be trusted, neither can the fairness of the election process.

Therefore, although I won't go so far as to pronounce the policymaker exception automatic for all Board positions, see Chabot v. Cty. of Rockland, New York, No. 18-cv-4109, 2019 WL 3338319, at *8 n.6 (S.D.N.Y. July 25, 2019) (rejecting this defense on a motion to dismiss because the defendant had not, "at this stage, m[et] her burden of proving . . . that the Clerk III position is a policymaker position"), the strong partisan character of boards of elections in New York State is a significant consideration. In fact, in certain respects, the Board is a fitting macrocosm of Justice Stevens's example in Branti: instead of "two election judges of different parties" supervising a voting precinct, it is two administrations – Democratic and Republican – supervising the entire election process.

10

Moreover, no matter how menial plaintiff claims his former position to have been, it was plainly substantively relevant to the political "nature of the election process." See Mirabella, 507 F. Supp. at 340. Perhaps most significantly, as plaintiff admits in his responsive Local Rule 56.1 Statement, several of plaintiff's responsibilities required that he accompany, or be accompanied by, his Democratic counterpart within the Board. For example, "[w]hen Plaintiff audited voting machines . . . he always did so with a Democratic counterpart." And a Democrat "supervised and double-checked" all data entry by the processing department, for which Torres was the liaison to the Commissioner. This cross-party supervision goes to the heart of New York's vision for partisan balance in maintaining the fairness of elections. See Mirabella, 507 F. Supp. at 340; Hering, 814 F. Supp. at 357.

Finally, the position of Senior Assistant Commissioner reflects, at least, a critical mass of the indicia of a so-called "policymaker." See Vezzetti, 22 F.3d at 486. The job itself is the third-highest within the Republican Administration and its title appropriately reflects that rank to the public. Plaintiff was also civil-service exempt, as were all of the Board employees. This fact is of outsized importance in the Vezzetti analysis – though not presumptively dispositive, as it is in the Fourth Circuit – because "New York has considered many of the same criteria for non-civil service status as does a court in determining whether a position is exempt from First Amendment protection." See Regan, 984 F.2d at 580. In addition, the Senior Assistant Commissioner was one of only five overtime-exempt employees on the Board (along with the Commissioner, Deputy Commissioner, Assistant Commissioner, and Hispanic Outreach Coordinator), which can be considered a sign that he held a policymaker position. See Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 139 (2d Cir. 1999) (explaining that plaintiff's ability to receive overtime pay "suggest[s] that [he] in fact held a role below the level of policymaker").

There was no formal job description for the Senior Assistant Commissioner, but plaintiff filled various roles within the Board, spanning voter registration, election results processing, precinct equipment oversight, FOIL request management, interdepartmental liaison, project supervisor, and aid to the Deputy Commissioner. This also leans in favor of applying the policymaker exception. See Ness, 660 F.2d at 520 ("[E]mployees . . . whose responsibilities are either not well defined or of broad scope are more likely to function as policymakers."). Although it isn't clear to what extent plaintiff was inherently responsible for supervising those below him, he certainly exerted control over numerous lower-level Board employees when asked to do so by the Commissioner or Deputy Commissioner. As the Second Circuit stated in Regan, 984 F.2d at 580, "[t]here is no likely circumstance in which a shared ideology is more important than when an elected official appoints a deputy who may act in his or her stead."

Plaintiff was hired in 2007 at the behest of the Suffolk County Republican Party Chairman, and in 2015 he was fired at the urging of the Suffolk County Republican Party Chairman. In the end, plaintiff held a position on the Board that demanded party loyalty and his termination was therefore fair game under the policymaker exception. See Savage, 850 F.2d at 68 ("[P]olitical affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance.").

## CONCLUSION

Defendants' [48, 52] motion for summary judgment is granted. The Clerk is directed to enter judgment, dismissing the case.

**SO ORDERED.**

_____<br>U.S.D.J.

Dated: Brooklyn, New York
       March 26, 2020